Here ye, here ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan M. Hutchinson will preside. Please be seated, everyone. Your Honor, the first case on the docket is Sue-22-0423 commemorating the marriage of Lori Rozdolsky, Petitioner Appellee, and Terry Rozdolsky, Respondent Appellate. Argument will be kept with the Appellate, Ms. Valerie I. Steiner. Argument will be kept with the Appellee, Mr. Michael J. Berger. Good morning, counsel and guests. Whenever you're ready, Ms. Steiner, you may proceed. Pardon me? Yes. May it please the Court. Valerie Steiner from Steiner, Howarth, Piscuasy & Hatch, arguing on behalf of the Appellant, Terry Rozdolsky. Your Honor, Mr. Rozdolsky is appealing the trial court's revised judgment of dissolution of marriage entered on October 20, 2022. The trial court abused its discretion and made findings against the manifest weight of the evidence in several areas, which ultimately rendered the revised judgment unfair and inequitable. The most impactful error by the court was its failure to understand the pervasive impact, its factual findings regarding Harbortown and the industry in which Harbortown operates, that it had on several aspects of its judgment, including the value of Harbortown, the installment plan terms, and the division of property. Ms. Rozdolsky's expert, Mr. Bart, premised the value of Harbortown on his mistaken forecast of the frame industry, specifically that the industry in which Harbortown operates is one of growth. Ms. Steiner, didn't the court disagree with Mr. Bart and kind of change or adapt her understanding or her impression of the value of the business lower than he had indicated, stating that he misinterpreted the, quote-unquote, mature nature of the business? So did the court not kind of correct that? No, it did not, Justice Shostak. The court only made that correction as it relates to the discount for lack of marketability, but it also impacted his growth rate, the growth rates, the rate of return, and the margins, and the methodology he selected. Most importantly, the rate of return, which the court made no adjustments to. The rate of return, Your Honors, is the risk that the expert applies to the cash flow to determine the inherent risk for the prospective buyer. And so by failing to accurately assess the risk of the market itself and the company itself, it's declining profits, it's declining sales, and it's shrinking customer rate. There's no way that Mr. Bart could forecast a proper rate of return for the company itself. You said for the risk for the buyer. This company is not currently being sold, correct? It's not currently being sold, Your Honor. However, in valuing a company, the court must assign the fair market value to the company. So in that context, the expert assumes that the entity is being sold to a hypothetical third-party buyer. I understand that. But wouldn't this assessment that's been made by the court take into account the goodwill of the current owner who has been in this business, the current owners, because they were co-owners at some point. But your client's been in the business since 1988, and he has attracted quite a clientele as a result of that, not just here in this country, but internationally. And that also goes into this particular assessment, correct, or evaluation? It does go into this assessment, Justice Hutchinson. However, the court accurately pointed out that the customer base has been cut in half since Harbortown's peak in 2012 and 2013. And in terms of the prospective buyer, selling this entity to a prospective buyer, you have to consider the market in which the entity operates, and that's the frame industry, which the court accurately found was mature and declining. And that's where Mr. Bart made his error, and the court's failure to understand the relationship between its factual findings and the risks relating to the rate of return made the court's reliance on Mr. Bart's rate of return wholly unreliable. Well, but the trial court did not accept Mr. Bart's actual evaluation. There she considered it, and she tempered it, I'll say, with factors that she had heard from the other assessor or the other evaluator from now I can't remember his name. Mr. Morris? Mr. Gould here. Okay, there we go. So, oh, that's right, Morris might have been on the house, right? But she didn't juggle, but she weighed pieces of each party's evaluator expert to come up with her evaluation, and essentially that is not unusual. It's not improper, and it is also something that the Supreme Court and other appellate courts have used. It is true that when a court finds that a value falls between two experts, it's given a significant amount of discretion. However, the court has also held that the foundation for those expert opinions must be on a proper foundation, and here it wasn't. Again, the court... But the court rejected Gould's evaluation because the court said that the use of the 2020 year, which was the pandemic, he used the growth rate was wrong. There was like six or seven reasons why the court said she rejected Gould. So she had that opportunity to look at the credibility or her determination of what was credible on each expert. He thought that the goodwill of Terry was only 30%. There were different areas, so how did we find that the court abused its discretion more, that what the court did was against the manifest way of the evidence? I don't want to hold you forever on this one issue, but, I mean, tell me how we proceed to reverse that. Certainly, and it's an important issue, so I'm happy to discuss it, Justice Shostak. The court, because the court misunderstood, its factual findings undermined Mr. Barth's evaluation. Even though the value that the court concluded was in between the two experts, the court indicated in its findings after its discussion of Mr. Gould that it relied on Mr. Barth's report. So as it related to the indication of fair market value itself, the court focused on Mr. Barth's report with just some minor adjustments. Only on the discount for lack of marketability and the personal goodwill, which is the amount that's after you reach the indication of fair market value, did the court take into consideration some of Mr. Gould's criticisms and made adjustments to Mr. Barth's report. Otherwise, the court solely relied on Mr. Barth, solely relied on his rate of return, made adjustments to the growth rate only because the court found that it was too optimistic in the context of the pandemic, without analyzing how Harbortown itself was doing under the pandemic. And the evidence, the underlying evidence, including its profit margins, that in 2020 it stabilized. The evidence suggested that it had a neutral impact, the pandemic had a neutral impact on Harbortown. Therefore, it was incorrect to assume that Harbortown, a company that operates in a small percent of the 5.1% of the overarching home furnishings and wholesale industry, would grow at the same rate as those other companies like floor and construction, etc. And in making the adjustments to the growth rate, both Mr. Barth and the judge failed to take into account Harbortown's own specific industry headwinds, the risks, which were the factual findings. So the evidence, the court's findings, make it so that you cannot at all rely on his discounted cash flow method. The discount for lack of marketability and the personal goodwill is a separate issue. And you can rely on one but not the other, because that's applied after the expert reaches the indication for fair market value. But Harbortown hasn't lost any of its primary clients, the big ones that we hear about in the briefs anyway. Target, Walmart, Hobby Lobby, I guess, and Michaels. And in fact, Target has been with Mr. Rodzalski, excuse me if I don't pronounce the name correctly, since he left his previous employment, which is over 25 years ago, 20 years ago. So, I mean, he's not losing anything and they are still apparently buying things. And once again, I'm looking at the goodwill because they're apparently doing so based upon a long-term relationship with him, who is helping to make their companies also profitable. Your Honor, Harbortown still had Target, Harbortown, and Michaels, which are its major customers. However, its overall customer base has been cut in half and the sales reports indicate there's a decline in sales overall. Over $20 million, $24 million since its peak. Further, the trial court actually made a factual finding that Harbortown's current concentration in those three customers is a significant risk. Something else the court criticized Mr. Bart for not taking into consideration accurately, but again, the court only considered the risks associated with Harbortown for the discount for lack of marketability and not the rate of return, which is the discount rate, the capitalization rate, which is the actual number that is supposed to take into account the risk of the company itself. And that's where the court erred. An IRS revenue ruling 5960, which no one disagrees that it's the foundation for evaluation theory, requires the expert to consider the facts and circumstances of the industry, the risks associated with that particular company's sales, and Mr. Bart simply did not do that. He was very convincing to the court, and the court took Mr. Bart very seriously in his presentation that this is just a rigid process. This doesn't require subjective analysis. And even though the trial court acknowledged in its ruling that this is a subjective process, it was very difficult for the court to accept that when analyzing each component of the valuation itself. That was the biggest criticism of Mr. Gould, was that he used his professional judgment. He considered the factors of the declining market, the maturity of the market, the declining company, when he considered the growth rates, when he chose his method, when he selected the rate of return that he used. And that's where the court criticized him, and that's where the court was wrong. Well, when Mr. Bart was chosen, did you move to strike his expert testimony or his expert reports? No, because that wouldn't be a proper basis to strike it. He went through the process. You're complaining about, it sounds to me like his qualifications to know what he was doing. He did not use the proper standards, which would be a basis to strike an expert or attempt to strike an expert. He alleged he used the proper standards, and he went through the buildup to the rate of return, but he didn't take into consideration these specific facts because he didn't agree that those existed. And that's a factual issue that the trial court would consider, and that's why it's not a proper basis for a motion to strike. That's a proper basis for the court to decline to find that he was not credible, that his report was without a proper foundation. And that's what I'm arguing here today, Erin. Are we okay on this particular issue? Can I move on to another issue? I'm going to talk about the maintenance. Okay. The court really gave Mrs. R, for short, the warehouse which would allow her to get the rental income. Then subsequently the court grants her $46,000 a month maintenance. Was it your understanding, and I know she said she was going to review it in a year, is it your understanding that that maintenance is there to ensure that he's paying the rent? Or what is the basis for this additional $46,000 a month for one year? My understanding, and the court in its ruling indicated that it wanted to, and the court wanted to ensure that Terry, or that Ms. Ristolsky would receive the property payments, in particular that $5 million, so within 60 days. Because the court anticipated that once Ms. Ristolsky received those monies, then Ms. Ristolsky would not need maintenance any longer. Because coupled with her rent from Harbortown, et cetera, she should have a sufficient rate of return. But what the court did not consider was her other income-producing assets. When the court analyzed maintenance and considered, okay, well, when she receives the $5 million, she'll be okay, the court failed to consider that in addition to just the $1 million of transferred cash from Ms. Ristolsky, she had approximately $1 million of cash in her own possession as well. So when the court was talking about income-producing assets, the court did not consider that, only the $1 million of equity. Further, the court did not consider that she was awarded a vacant piece of property in Libertyville, which she could rent or sell and then generate additional income on that. And additionally, the court did not consider the Florida residences that she was awarded as well, that the parties had historically rented, both of them in a revised judgment. And the court gave her those Florida residences because they felt that the two of them could not guarantee a work together in maintaining the mutual area of those two units, correct? Exactly. So then how did the court justify her being the landlord? That is exactly the problem we have, Your Honor, because by the court awarding Ms. Ristolsky Ballard and making her landlord for Terry, she put the parties in a contentious business relationship. May I finish my? Yes. Thank you. In a contentious business relationship position, which our case law over and over again says that the court disfavors that kind of relationship in tying people together in the future. It was further an issue because Ballard is where Mr. Ristolsky operates Harbortown. So what is your suggestion? Well, first, the suggestion relating to maintenance ties to the division of property, which we believe was contrary to the economic circumstances of the parties resulting from this division, was very one-sided and very onerous for our client. That is impacted by the valuation of Harbortown itself, and if that's corrected, then I'm not sure where the court would fall in terms of what assets are allocated to each party. What is your recommendation with respect to her maintaining the building, owning the building and having to deal with him with respect to leases, you know, every coming so many years? I mean, do you think, is there something you think that would work better should we remand this to the trial? Certainly. I certainly think it was abuse of discretion and that Ballard should be awarded to Terry. But the court, upon remand, the court has many equitable ways to make this property division and maintenance functional. If the court shifts Ballard to Mr. Ristolsky and Ballard is tied to Harbortown, the court can make other decisions with respect to property. If the court considered the economic circumstances of the parties, the court may decide that he should get a higher proportion of the assets. The court also has other equitable powers. It could influence other areas of the award, not just property. So it could have additional consequences, but that's something that I believe the trial court should consider. The trial court did consider in this lease. They considered, I think she considered greatly her desire that this business continue at the level that it has been continuing, thus giving the wife the business so that he wasn't paying all of this maintenance out to her that was going to impact him in running the business. Was that not a reasonable thing to do? I mean, the judge seemed very thoughtful in her decision. In isolation, it appears thoughtful, but it's also contradictory because she also found Harbortown was declining. And if the court was concerned about him paying maintenance in the long term, the court didn't recognize those similar concerns in increasing interest on that payment plan from 1 percent to 9 percent. Well, that's a whole other issue. Exactly. But it's all tied together because it all relates to equity. The property division and the equitable result of shifting the retirement to Ms. Roszkowski, of increasing the interest in the payment plan, that plays into maintenance. It all relates to each other. So I think Your Honor is accurately pointing out that if you make one adjustment to one place, there may be an adjustment somewhere else, and that's a consequence. However, it's important, if the court chooses to remand, to give direction, to consider the economic circumstances of its result on both parties, not just Lori, and also correct some of the errors, including that the court falsely believed that Mr. Roszkowski could borrow against the equity of Harbortown, which was an overarching theme that encouraged the court to make the award it did. The court found that Terry had access to that $42 million that the court assigned to Terry, when in fact there was testimony from Ken Hollow, a Fifth Third Bank representative, that he cannot access that for personal reasons, and also the Fifth Third Bank loan, which states that Terry cannot borrow against Harbortown other than the line of credit that he already had, and to do so would cause him to violate those terms. And that is something the court appeared to have forgotten. So there are numerous contradictions in the factual contradictions and contradictions between each component of the maintenance and the property division. There seems to be a lot of conversation in the briefs about the Ballard lease and locating the Ballard lease. They have been paying this rent, this triple net lease, for as many years as that trust has existed. Why all of a sudden is it a problem? Your Honor, that's a good question. Because it's a divorce. Well, I know that, but why really? Because during, since 2000, since Terry acquired Harbortown, Terry was both the landlord and the tenant. Right, but now there's a trust that is, the trust owns the Ballard property, and they used to pay it on a regular basis. It doesn't seem like it, the, Harbortown ever neglected their triple lease payment before. But now that she is landlord, he's deducting things that he's supposed to be paying, that he never deducted before. Your Honor, that was for a short period of time between the revised, or the original judgment and the revised judgment. In the revised judgment, the court clearly stated that, in its consideration of maintenance, actually, the court stated that it considered that Ms. Rzdolski would be paying real estate taxes. So the court did not impose lease terms on the parties in that original judgment. Mr. Rzdolski was paying the 42, the, he was paying what the court determined to be the fair market rent, minus the items that, based on the court's judgment, Terry rightfully believed, and the court acknowledged that she created confusion with her original judgment by making some of these statements. So he deducted that, believing that he was allowed to. But then it got straightened out. Then it got straightened out. So we don't need to find or locate this valid lease if these parties stay in this relationship. They may have to renew at some point in time. That may cause a problem. But right now, there is a valid lease in place that they've been working with for a significant period of time. There's a valid lease, and that's not part of the record. It wasn't before the court at that time, and it's not included in the supplemental record. But there are various terms that are negotiated that may or may not relate to what's going on here today or other factors. So we don't know in terms of the, I'm not, I'm cautious to talk too much about a document that's not in the record. But certainly, your honors are well aware of the wealth of litigiousness involved in landlord-tenant relationships, much less commercial landlord-tenant relationships. So the mere existence of a lease itself doesn't resolve any of the concerns that the courts have historically had with forcing divorced spouses to be in a business relationship. Okay. All right. Justice Kennedy, any questions? All right. You will have an opportunity to respond after Mr. Berger if you choose to. Thank you. Thank you very much. Mr. Berger. May I proceed? Yes. May it please the Court, Michael Berger and Jennifer Cantrell of Berger Schatz on behalf of Mrs. Rustowski, Laurie Rustowski. Mr. Berger, can I ask you to pull the mic maybe a little closer? Sure, sure. And we are recording this, and anybody who wants to hear it afterwards needs to be able to hear you. My pleasure. This case was on trial for six weeks, every day for six weeks. This trial judge was completely aware of all the facts, all the circumstances, as any judge could ever be. She dealt with pretrial issues before the case went to trial. She dealt with the case every day. We were there during COVID, in person, every day, all day. She wrote a 56-page memorandum of opinion in detail, setting forth all her basis for her decision. Now, I will say that she ultimately changed some of those matters on reconsideration. Yes, and I was about to speak to that. She thereafter issued a 28-page opinion on the motion to reconsider and clarify, which provided for substantial justice between the parties. Her rulings were thoughtful, thorough, and meticulous. The level of thought and analysis is rarely seen by practitioners like myself. I've been practicing law for 50 years. I'm not sure I've ever seen a written opinion as detailed, more thoughtful, and more reasonable in my entire career. Let me talk to you about the motion to reconsider with respect to that interest rate going from 1% to 9%. Yes, Judge. Are you saying that this was done for substantial justice? Because certainly there was nothing new that would make her have to reconsider 1% to 9%. Your Honor, Mr. Rustowski, at the close of the judgment or revised judgment, had $65 million of assets with no debt. No debt. He had a $16 million valued house on the lake in Lake Forest, a mansion, no debt, no mortgage, no nothing. In fact, he spent $25 million of their money on that house immediately prior to the divorce and during the divorce. And that I will speak to in a moment. The reality is that the judge could have ordered him to sell or borrow at that time. There was no testimony by Mr. Holub that he could not borrow against the equity of, as the gentleman from the bank, that he couldn't borrow against the equity of Howertown. There's nothing in the record to support what Ms. Steiner just said. He came on as a witness based on a line of credit. And he testified, if you have a line of credit, you're supposed to use it for business purposes. But then when I asked him, I go, where'd the money go? It went into the operating account. Do you know what was being paid out of the operating account? No. The record reflects that Mr. Hrozdowski used the operating account as a piggy bank. And I'll speak to that in a moment. But because the judge didn't want to interfere with the operations of Howertown, and I guess she wanted to make Mr. Hrozdowski happy on some level, she didn't order the sale of his mansion on the lake in Lake Michigan. She didn't even ask him to encumber it. She made Ms. Hrozdowski, and has made Ms. Hrozdowski, wait for 10 years to get her money at 1% percent of inflation. She realized it was not fair. It was not fair on any level to make this woman wait for $18 million or $19 million, which Mr. Hrozdowski had the ability to get at the time, unless she got a reasonable rate of return on her money. Well, you said it wasn't even inflation. Why did she choose 9% as a statutory rate? So why didn't she choose something else in between 1 and 9 if she was worried about substantial justice? Well, because that would be substantial justice. If you look at this record, if you look at the contentiousness, if you look at the things that Mr. Hrozdowski did during these five or six years, it's outrageous. I mean, it's outrageous. There's no divorce that's a happy divorce, Mr. Berger. And even if they start out looking happy, post-judgment they become a nightmare. So, I mean, I accept that premise, that they're not happy. They weren't happy together. They're not happy now. That's absolutely true, Judge. But in keeping with Polsky and the marriage of Polsky, she wanted to incentivize Mr. Hrozdowski to pay the money. He violated every order that was basically ever entered in the case. But putting that aside, if he wanted, if he didn't want to pay that statutory interest, Your Honor, she said, you can go borrow. You can borrow against the business. And you can borrow not just against the business, as they keep saying, but you can borrow against the house that you spent $25 million on that I valued at $16 million because that was the fair market value. Go get a mortgage. It would be less than 9%. Pay Mrs. Hrozdowski. It was her way of protecting Mrs. Hrozdowski from Mr. Hrozdowski. Is that your opinion as to why she ordered the maintenance for a year? Yes. Well, that was part of it along with the bailout situation, Judge. There were no other assets to give her. She had already, excuse me, Mr. Hrozdowski already had the business with no debt on it, line of credits for operational purposes, no debt. The house, $16 million she valued at, no debt. There was nothing else. What are you going to assign to her? Plus, if she hadn't gotten the bailed property, and by the way, he used to charge himself $100,000-plus a month. And what was said in the opinion was significantly less than that. And I won't discuss unless you ask me what the current situation is. But my point is, is that there was nothing else to provide to Mrs. Hrozdowski, or she would then have to wait for another $6 million for another 10 years. She didn't even get her money that she was supposed to get at the time of the judgment from Mr. Hrozdowski. She didn't get the money that she was supposed to get for six months after the divorce. So in the maintenance situation, she was concerned. She wanted her to have an income-producing property. That was the only way, because these people, their lifestyle judge, these people had four houses. They had a $3 million house that they paid for in Lake Geneva, plus a house in Lake Forest, plus the two condominiums. They had a private jet for years. They lived an opulent lifestyle. And if she was not going to get, receive indefinite maintenance, being married for 22-plus years at the time of the divorce, of the filing, then she had to have something to generate income. Did she get the $5 million that she was supposed to get within 60 days and the $2 million in, I guess it was May of that year? No. When did they come? I'll tell you exactly. And before that, Your Honor, as part of her ruling on maintenance, she had assumed that there was $15 million of retained earnings that could be divided. What? I'm sorry. She assumed that there was $15 million of retained earnings inside Harbor Town, and she assumed in her maintenance order that Mrs. Hrozdowski was going to receive $7.5 million upon the entry of the judgment or within 30 days or whatever it was, plus this $5 million payment. She received in August of that year, $2.5 million, and in December, $2.5 million. And I'm not going to tell you how difficult that was to obtain. The reality is, is that before the Ballard situation, my guess is she would have received indefinite maintenance at a significant dollar amount, at least offsetting what the mortgage or, excuse me, what the rent was to be paid. But I think the judge saw enough conflict as it related to Mrs. Hrozdowski that she wanted to try to avoid that on a month-to-month basis. Couldn't the judge have divided up the marital residence, given her maintenance, and given him the building? I mean, how is there going to be any conflict-free business going on when there is such disdain between these two people on a lease? Well, there's no disdain, Your Honor, on behalf of Mrs. Hrozdowski. There isn't. There's nothing in the evidence that you can suggest. Well, counsel, the court did find that they couldn't get along to the extent that they could share the Florida property. But why? I know there was common area. But why does it make sense then to put them in this business relationship indefinitely? They're not in a business relationship at all. It's a lease. She gets paid a lease amount, a monthly check, under a triple that lease. And when is it renegotiated? It's already been renegotiated. For how long? I can't tell you, but it's at least three years or maybe five years. All he has to do is pay his rent. And, Your Honor, he has a right to move elsewhere. This is not a company that has manufacturing equipment. This is not a huge move. It's a warehouse. It's a warehouse with a couple of executive offices. So if he doesn't like the lease, he can end it whenever he wants to end it per the lease and go on. And she'll rent the building to a different tenant, or she'll rent it or she'll sell it. It's not imperative to his business, especially not now. And the record reflects that the majority of the stuff or the stuff, the majority of the frames or the merchandise that he provides is drop-shipped. It doesn't even come through the warehouse. It comes directly to the purchaser. So it's not like they're in business together. They're not. They negotiate a lease between their lawyers. Negotiation is done. He sends a check once a month. Adios. There's no conflict. There's nothing they have. They don't have to deal with anything. Mr. Zasowski doesn't have to talk to Mrs. Zasowski, et cetera. And it's really not an accurate example to compare the two townhouses, which were joined together with a business that's a big building that Mrs. Zasowski never goes to. She doesn't have to go to all. She needs to do that. And that's how she can support herself in a semblance of the kind of opulent lifestyle they had. Well, they don't have the jet anymore. They don't have the jet anymore. It was sold during the divorce case. The $3 million house in Lake Geneva, the money went into the business, and it all went out to buy and to furnish a $16 million house. He took all the liquidity out of the estate, judges. The reality is that Mr. Zasowski created a situation here. And as I would say, all the issues but two are based on an abuse of discretion standard. The other two that are not manifest way to the evidence are the IRA and the value of Harbor Town Judge. The court, most importantly, the court found that Mr. Zasowski was not credible, and he demonstrated. And she went through it. She was in the best position to weigh all the evidence and determine credibility of the witnesses. Well, but the credibility issues on the valuation of Harbor Town didn't necessarily relate to Mr. Are they related to Mr. Gould and Mr. Barth? Respectfully, that's not correct. It is not? No, ma'am. Okay. And I'll tell you why. And in speaking to that, you have Mr. Gould. Mr. Gould is a professional witness who testifies almost entirely in divorce cases. Okay? He valued the business at 70 percent, not at 100 percent, but there are a couple of mentions on what 100 percent would be. Okay? What is not before you is that Mr. Zasowski committed fraud, multiple fraud. He failed? If it's not before us, was it before the trial court? Yes. Yes. And she made findings on it, Judge. She made findings on it. She made findings that he made. Mr. Gould's report is based on 70 percent, not 100 percent. But then he backed into 100 percent in connection with some of his opinions. And her findings regarding Mr. Gould, your honors have read, sure. But without speaking to Mr. Gould per se, and as the court has already established, the court did not accept everything Mr. Bart said. She found him to be highly qualified. She found him to be much more credible. But she didn't accept everything he said. And she didn't accept his opinion regarding the maturity of the industry, et cetera. But overall, she found that he was more credible than Mr. Gould, that she said in part of her, one of her decisions, that she thought Mr. Gould's opinion as to one issue, he pulled it out of a hat. Mr. Gould's opinion relied tremendously on Mr. Zasowski. That's why credibility is so important. That's the answer to your question, Justice Hutchinson. Much of his report, Mr. Gould's report, is predicated on what Mr. Zasowski told him. It's all in the report. It's all over the record. And what he told them wasn't exactly true, including the fact that the children owned 30 percent of the company and that he only owned 100 percent. He only owned 100? I mean, not 70 percent. I apologize. That's why we went to law school, because we can't do math. Exactly. The court did say that he, when it came to financial decisions, that Terry tended to testify as to whatever was most advantageous to him, whether it's either lying or stretching the truth with respect to finances. She was more critical of his credibility than she was Gould's or Bart's. Well, Mr. Gould didn't pretend or try to commit fraud on the court. She found that his actions allegedly transferring 30 percent of Harbortown to his children was a fraud on Mrs. Zasowski's marital rights. She also found when he was issuing K-1s out of Harbortown that reflected his children were receiving millions of dollars in distributions, he took them all. They never received any of that money. Mr. Gould's report reflects the fact that the kids are getting all these distributions. Mr. Gould's report essentially relied on his own professional, quote-unquote, judgment in keeping with things he learned from Mrs. Zasowski. His report is in contrary, his opinions contradict the very sources he used in his report, as pointed out by Judge Christensen. But didn't, I mean, if he issued the tax document to the children, didn't somebody look at that tax document as opposed to just take Mr. Zasowski's word for it? Well, I can tell you that I did. I can tell you that Mr. Bart did. Mr. Gould didn't. Bless you. Mr. Gould assumed, according to Mr. Zasowski, that the three children owned 30% in the area and they got that money. They didn't get anything. And the reality is that Mr. Gould used his, quote, personal judgment for almost everything he put in his report. Keep in mind that every time he used his personal judgment, it was contrary to his source material and it lowered the value of the business. It's also very, very important that the judge made seven specific findings of why Mr. Gould was not credible. He didn't even review personal financial records. He didn't review credit cards where hundreds of thousands of dollars of expenses were being paid by Mrs. Zasowski through the business. Well, there weren't any outstanding credit card debts, right, in this particular? No, no, Judge. Okay. It's just his use of Harbortown as his personal piggy bank. That was what was going on here. It took tremendous time and effort to obtain the records he thought Mrs. Zasowski ever see any of the records for Harbortown. It took us more than a year to be able to see a general ledger. And in that general ledger, you could see the fraud, you could see the spending, you could see what he was doing and why he was fighting. She specifically, that being the judge, he filed a false affidavit in connection. He had the audacity to say, well, first of all, we cannot download our general ledgers. You're not going to see them. It's too much difficulty. No one in Harbortown has the ability to access, except for one person who's not an employee and unavailable to access the applied software. Okay. That was obviously not true at all. Then what happens is he files an affidavit to that effect, and then he testifies, well, you know, it was my lawyer's idea for me to do that. Okay. And then he says, well, now I recognize everybody can look at our records. And then he went on to say, well, I signed that false affidavit, which the judge points out significantly. She significantly has said that he had no credibility. Throughout the record, you'll find no credibility, no truthfulness, forgetting his behavior. The fact of the matter is that Mr. Gould used outdated material, and a very important part, because there's much more. In determining value using an income approach, Judge, or Justices, you need to use the weighted average cost of capital. That's a mathematical calculation. It's taken from a lot of outside sources as to what is being, you know, what the cost of equity is, what's that, et cetera, et cetera, based on the standards. It's a calculation. He used the wrong standard as one of the elements. He made a major mistake, which he admitted in his weighted average cost of capital. He admitted it only in trial. He admitted it. But then he goes on to say, even though my weighted average cost of capital was wrong, I think my ending conclusion on value based on my personal knowledge is right. How could that possibly be? Everything in his report is based on 70% and a wrong whack. Weighted average cost of capital, which he admitted. His whole report is not credible. The judge found it less credible. Bless her. She did a wonderful job. I will just say to you that credibility here, it was huge. If you look at the issues that went on in this court, it's unbelievable. And the judge said, and I have to quote it, judge, because she says, in her opinion, but for the perseverance of Lori's counsel and the availability of the court's contempt power, Terry would not have produced the financial records. And, of course, it was only once Lori had access to these records that Terry's dissipation of marital assets and unbridled spending was brought to the court's attention. This is her quote. This is her quote. She called him out numerous times, rightfully so. He tried to commit fraud. He did commit fraud with the I.O.S., with the federal government, tried to commit fraud. I'm Mr. Zdowski. He tried to beat her down throughout this proceeding. That's why it took so long, judge. All right, Mr. Berger. Justice Shostak, anything else? Justice Kennedy? All right, your time is up. Thank you very much. We have other cases we have to get to. I appreciate it. Thank you very much. Thank you. May I begin, Your Honor? Yes. Your Honor, Mr. Berger's argument in his oral argument is similar to his response. He's making a huge statement about Terry's credibility, but Your Honor was absolutely correct that Terry's credibility plays no role in the evaluation. It's not in the evaluation, but how about the fidelity on Rick? It does play a role. And she found him not credible with respect to this. She did. Significantly. She did consider his credibility in terms of the IRA as it relates to the pattern of whether or not Mr. Ryszkowski contributed marital, additional marital during the gap periods. What about the tax refund? Didn't she find him not credible with respect to that? The tax refund, the 2019 tax refund? Yes. I don't believe so, Your Honor. What he did, what the court found was that he applied, consistent with his history, the 2019 tax refund to 2022. So I don't believe credibility played a role with the tax refund. But I think it's very important to clarify some of Mr. Berger's statements as it relates to the evaluation itself because he suggested that Mr. Gould rely upon Mr. Ryszkowski's statements that the children received the distributions, the 30% distributions. That played no role in Mr. Gould's analysis. Mr. Gould valued 100% of Harbortown. Well, why is, well, then why, according to Mr. Berger, he backed into 100% is what he said, but he stood on the premise that the children received 30% of the proceeds. Your Honor, both Mr. Gould and Mr. Bart valued Harbortown at 100%. Both Mr. Gould and Mr. Bart also offered a value of 70% because that was an issue at trial. So both experts valued the entities 100% and 70%. So the same criticisms should be made of Mr. Bart as well. And both experts, valuing the entity at 100% versus 70% didn't impact their evaluation process at all. And, Your Honor, I just want to, Mr. Berger pointed out to a statement made by the court about pulling a number of her hat, which highlights what I was stating before in terms of Mr. Bart and Ms. Rostowski presenting this, the rate of return in particular, the cost of equity, as such a rigid process, and the court accepting, buying into her belief that this was just a rigid mathematical calculation, the cost of equity. Mr. Bart admitted that the cost of equity falls within the professional judgment of the court. The cost of equity is a component of the rate of return, which is governed by the IRS Revenue Rule 5960, which specifically states that valuing a closely held company is very difficult. There's no book you can pull a rate of return from that the court, that the evaluator must consider the facts, must consider the reasonableness of that rate of return in the context of this company and this industry, which Mr. Bart did not because he didn't believe in those facts. Well, and therefore, when Judge Christensen came to her decision that was neither Mr. Gould's number or Mr. Bart's number, she, according to her, took that into account. Only as it relates to the discount for lack of marketability, which is a consideration that the court, that the experts addressed after they reached the indication of fair market value. After you apply the rate of return, that's after the methodologies are applied. So the methodology, the growth rates, the rate of return, all those, which the court did not make any adjustments for its factual findings, though it's very clear in the record in IRS Revenue Ruling that the court had to. She made no adjustments for that. Only then, only after then, do you consider if there's additional discounts to be made to the value, and that's the discount for lack of marketability in personal goodwill. Separate issues. And that separate issue, that's the only place the court applied its factual findings as it relates to the decline of the industry and the decline of Harbortown. And that was inappropriate because the law, the purpose of the rate of return, the purpose of income approaches, all income approaches are prospective. You're trying to anticipate what a hypothetical buyer is going to receive as a result of this investment, the cash flow. So if you miss a forecast, if an expert misses a forecast, the maturity of the market, the decline, then that expert cannot accurately assess the risk of that cash flow. And that was a big problem. And, Judge, I really think it's important. Your Honor, Justice, I apologize. It's really important for me to reference Mr. Berger's statement that the court even said pulling a number out of a hat. This wasn't a reference to personal goodwill. And the court, in its revised finding, regretted that decision. The court stated, though Mr. Gould appeared to be pulling a number out of his hat with respect to personal goodwill, that unfortunate description by the court is more of an indictment of the lack of a standard method to calculate goodwill. And this highlights the court's misunderstanding as to the necessity of using professional judgment by an expert when valuing an entity. It is not a mathematical calculation, as Mr. Berger indicated. His own expert admitted it directly on the point that Mr. Berger tried to say it was a mathematical calculation. The IRS Revenue Ruling, the underlying foundation of valuation principles, which neither expert disagrees with, though they didn't apply it similarly, don't agree that it's just a mathematical calculation. The case law is very clear. This is subjective when it comes to a closely held business. Well, the IRS doesn't think it is, but necessarily. They believe it's a subject in terms of the rate of return for a closely held business. But they don't apply that when they actually impose sanctions and penalties. For any of these things, they apply a very objective standard. But that's another story. Yes. I have one question. Sure. We didn't really touch on it with either side. But the award of that loan to Terry from Mr. Krausek, it seems that, to me, that neither side really agrees with the dollar amount that the court had come up with with respect to the loan. Would it be prudent to remand it for the court to hear both sides in making the determination as to that loan? Or do you feel that the appellate court has the ability to make that determination? I believe the appellate court has the ability to make that determination. If the case is remanded generally, it might make sense to just have the court do that. But in looking at the briefs by both sides, both sides agree that the number used by the court was too high. Right. All right. I have nothing further. Justice Kennedy? I don't either. So if you want to summarize, you may do so. In summary, Your Honors, when you're reviewing the valuation, when you're reviewing the maintenance, when you're reviewing the property division, it is incredibly important to understand the relationship of the court's factual findings as to each of those, and particularly the statements relating to Harbortown and the decline, because what the court assumed is it related to maintenance. And even if the court made those factual findings, the court misapplied them for purposes of the valuation. The court failed to accurately consider the declining nature of Harbortown in awarding the property and making the maintenance determination. The court made comments as to its historical profitability without, again, revisiting its declining nature and finding, well, Terry can just rebuild his retirement. Well, Terry can, you know, maintain his lifestyle. But the court made it virtually impossible with its terms in both the maintenance and property section because the court increased the rate to 9% for that installment plan, making the interest almost equal to those $2 million payments. And the court made the statement, Terry, from the profits, can rebuild his retirement, even though I am concerned about his ability to do so. Yet the court made this decision anyways. So what I implore the court to do is consider the economic circumstances of the court's award on both parties, not just Ms. Rosalski. Thank you, Your Honors. Thank you. Thank you, counsel, for your arguments this morning. We will take this matter under advisement, and we are going to stand in recess to get ready for it.